Be seated. Next case is the adoption of J.J.S., a minor, 5-17-0243, Hatch. I'm sorry? Okay. That was the right spot. Okay. Introduce yourself. Good morning, your honors. My name is Dennis Hatch. I represent Chad, Stanford, in this case. Pleased to support and counsel. In this case, the minor was born on September 24th, 2006, between me, Susan Miller, and my client. The parties broke up in 2007, when the minor was approximately 16 months old. At that time, in 2008, a short time after that, Susan Miller passed away.        I'm sorry? Okay. That was the right spot. The petition was filed in February of 2016. The focus of my argument is going to be basically on the burden that had to be proven at all stages of the proceedings. Maybe we should shorten the facts a little. I might get the cases confused. This $50 a month is what he was paying. Yes, the child support. And he'd never seen the child since birth? Or had he? He had attempted. But he did not see the child for approximately... Almost all his life. Yeah, six years maybe. And he's never gone to any baseball games, basketball, whatever the kid does. That's right. He's done nothing and he pays $50. Has he got some kind of a problem that he gets aid of some sort? Well, he's on disability. He had some insurance. Disability. He got that for a while, then it was taken away and then he was trying to get it back. And how much is a disability? I'm not sure if it ever became and then it went years ago. But he's never increased the $50 a month. No. And my understanding is sometimes his parents help him out on that. That's correct. And he's never seen a child for anything? Does he send any cards or letters? Well, that's one of the issues. The issue as far as cards, because of the relationship between my client and the stepfather. Not stepfather yet. Mother and stepfather. It was basically through the mother, his mother, because she had somewhat, for a period of time, a better relationship with Susan. The mother. And so he would send some things in, but at one point, and I don't know if the court remembers this, he had sent a, or he tried to have a visitation and it was probably outside of the time periods because of the factors of desertion and reasonableness of degree of interest and his intent under the 50 statutes. They told him, you cannot have visitation unless they're present. So he attempted to have it, but you're right, my client. And no Christmas presents, birthday presents, nothing? Way back, over the last three years or so, within these time periods in the 50s, nothing. And the child is speaking now, I'm assured. It's 10 years old. 10, okay. So anyway, you're getting back to my point here. That's fine. I'm going right through it. I don't want to spend too much time, but I didn't do it. So the crux of our argument is the burden on the mother. If you look at what's in the transcripts, there is practically no evidence to support the findings either at the first stage or especially at the termination-like stage, what's in the best interest of the minor. Basically, they called the mother, she testified a few minutes, and it's basically, I guess, hey. What we said. Right. Go, go, go. We can't do this. The problem was, we tried to raise the issue that they impeded any type of relationship with his son. And based upon that, my client felt, I'm not going to get myself involved in this at this child's young age. And what we're arguing is that the burden at the time of the unfitness was clear and convincing, but for him to raise the issue of impediment, it was preponderance of the evidence. And we're arguing that at least on that issue, he basically testified about they didn't want him to have visitation, they moved four times, there were other factors. There was also at one point allegations that he pulled the gun on them at some type of contact between the mother. So this whole hostile environment continued. So that's our argument on the first stage. On the second stage, when you get into the question of whether it's in the best interest for the parental rights to be terminated, there's some 14, 15, 16 different factors that the courts have to look at. The only two people that testified on those two factors was the natural mother and her new husband. Again, their testimony was 15, 20 minutes to a half hour at the most. Out of almost all of those factors, there was no evidence presented at all. And they have a burden. So I think that their rationale was just like the courts, he didn't do anything, that's all we got to show. But they do have a burden. And you don't put a burden on somebody who owns someone just to say it speaks for itself, therefore we're not going to address all these issues. And if you go through all the different factors about his cultural heritage, what happens at school, school people were called in, no one was called in to testify as to all of these factors. And they basically relied on the testimony of the mother and her new husband to try to lay the groundwork that it's in the best interest of the minor that his parental rights be terminated. There's also two other factors which I think are very important here. The guardian of life never interviewed my client. She made one visit to the minor's home, talked to him about 15 minutes. When I cross-examined her, she couldn't recall anything, but they talked about other than how things go and you like it here and things like that. She saw him one time out in public at a parade, I think it's in Trillium, Halloween parade, talked to him for a second day. Other than that, she had no other contact with him. She technically had contact with my client, who once again had issues with meeting with her, but there were five hearings throughout this that she never even, before the hearing or after the hearing, ever interviewed my client. Was this brought up on cross-examination? Yes. She never interviewed him. Was your client at all those hearings? Yes, everyone. So there was an issue there. She could have talked to him, and there were 19 hearings at the time. She could have talked to him at that time. The next issue was the interview. Was he available to be talked to? Yes. Did she want to talk to him? She was there once. And he wasn't there, was he? Right, and he called back, tried to make a, left a phone message. They never hooked up again. And this was started in February, I think, the first hearing. Let me look real quick. They're with me. Was it August or May? I can't remember. Okay. But she had plenty of time after that. Also, we raised the issue that she had contact with the family, the new father. She represented him in some case at some time, but she said, I don't remember what that was about. So it's our opinion that there was something going on here, much like everyone thinks. You don't have contact with your kid. My mind's made up. I don't need to talk to him. I don't need to check anything out. She never went to any schools, didn't do anything, to try to see if what the parents were telling her was the truth. Then at the in-camera interview, if you look at that interview by the judge, it was about ten pages. As I pointed out in my brief, about the first three or four pages of that are just introductory type things. Then throughout that interview of the child, if you look at it, the child answered some questions that were inconsistent with what supposedly he wanted. So then the judge asked it again a different way. But throughout that, he never, in my opinion, talked to the minor in a way to find out what his true feelings were or whether or not he had been influenced by anyone. So all of his, if you look at the terminology, he talks about termination of parental rights, legal father, and other terms that a ten-year-old's not going to know. The ten-year-old, though, did call her new husband father, dad. Dad called him dad, right, which is understandable. I mean, if you look at most divorce cases, a lot of that can happen in there. That doesn't mean you fill in the next step of terminating the other parent's parental rights. So... Is there any evidence as to how much he does get in income? My client was yard work, picking up jobs, doing some construction and helping somebody. What is his handicap? I don't know. He had a back injury in a motorcycle accident, I believe, that messed him up. But I think that was later. That wasn't way back when they first got him started. That happened sometime after that. So he went to... Well, I didn't understand why the $50, when did that start? That seems like a low on me. Seems low on me, too. And I don't know why, and I guess that's the other issue, why didn't they increase it way back when? Well, he can't even afford the $50, apparently. Right. The attorney general, I think, got involved because they were not married, and she was on aid. And what we believe is the real reason why this came about is that she got injured, and she wanted to get on her husband's insurance. And that happened a month or so before they filed the petition. The state would not let her get off public aid insurance without having other insurance. So it's our belief that towards the end of this, that was the reason why she did it. Whether that's related at all because of the fact that he didn't do anything for all those years, that's another issue. But our biggest problem is that we believe that a burden means a burden, regardless of what the underlying reason was for the unfitness. They can't just bypass 15 different factors, not call them witnesses, and then have a court decide based upon one or two of those factors, which is allowable. But we believe in this case, there just wasn't enough evidence for them to meet their burden. The burden's got to mean something. You know, I kind of compare it to a criminal case because there's a high standard here of a no reasonable doubt from the clear and convincing standard. If they say so-and-so had cocaine, and they charge him and they take it to trial, but they never call a lab person to say, yeah, that is cocaine, they didn't meet the burden. They don't have any other evidence of what supposedly was sold. They didn't meet the burden. And we think that applies here, that same type of rationale. You can't just say for three months or greater than three months he deserted his child, by what the definition of that is, and did not add or go into the other hearing and present some evidence as to where he's living, no school records, nothing to substantiate all the factors the court has to look at. So I understand the court's feelings on the first hearing. I argue that there's an impediment there. Whether it's reasonable or not, obviously the court has to look at what the judge ruled on there. But on the second hearing, when you take into account the guardian's lack of doing anything in regards to meeting with my client, or basically just meeting with the minor one time, and the court kind of bouncing all over the place. My understanding was that when the GAL went to the house, that he was not there apparently. But is there any case law showing how hard the GAL must try to find the person? Well, there's some statutes that it's more directed at the minor than the adult that she has to make, or he has to make contact. I've not seen that many cases. Yeah, but he has to make contact prior to the hearing. At least I think once or twice now I think is what the statute says. I don't know if there's any requirement that the GAL do a certain level of investigation, but I don't know how she can render an opinion when she had the opportunity to find out, hey, Chad, what's going on here? She should have done something. Even if he's as lackadaisical or whatever, understanding this, you can look at his situation. He's got low income. He's got low education. At one point he thought he had to get a lawyer to, before I got appointed, I had to get a lawyer to represent me to change something. I had to, he went to Landon Lincoln and they told him he can't do it because we represented her at one point. So he's not obviously the most court savvy individual, but that still doesn't mean that the court and the petitioner doesn't have to meet their requirements. Especially at the second hearing. I think that whole second hearing on the fitness, best interest, is tainted by that. So I'm asking the court to reverse the judgment, send it back, and see where that goes. Thank you. Thank you. Good morning, Your Honors. Good morning. My name is Jay Zanton. I represent the appellee, Brendan and Susan Millett. Pleases the court and counsel. To get cut to the chase on this, on the burden of proof, we need to make certain we understand what the burden of proof is. Under the unfitness standard, you have to prove by clinic convincing evidence of the parent's unfitness. And in this case, when the petition for adoption was filed back in February of 2016, there were three allegations made as to the basis of the unfitness. Those allegations were a failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare, desertion of the child for more than three months next preceding the commencement of the proceeding, and then an evidence of an intent to forego parental rights as manifested by his failure for a period of 12 months to visit the child. It is not required that we prove all three of those. We just have to prove one. And in this case, the court actually found that all three applied. Under the reasonable degree of interest, the court, under the case law that I provided in the brief, is to consider the efforts that somebody made towards visitation and to maintain contact with the child, and that interest must be objectively reasonable. What do we have in this case? What we have in this case is the last contact that this individual had with this child was sometime in about 2011, about five years before we actually filed for the petition for the adoption. The last time he had any visitation of any kind was 2009, which was almost seven years. This child was born in 2006, September 2006. So we are talking an overwhelming majority of time in this case where the natural father had no contact with this child for whatever reason. It's interesting that during the course of the trial, the natural father actually admitted that he had made no effort over the last five years leading up to the filing of the petition for adoption to have any contact with this child. And that included whether it was communication by telephone, e-mail, text messages, letters, anything. Again, no visitation since 2009. He didn't make any effort to contact schools. And one of the things that was really interesting in this case was that for several years of the time frame that we're talking about, both my clients and the child lived in a small town called Sandoval. So did Mr. Stanford. This town is 1,200 people. And I think the court correctly pointed out in this case that it would be virtually impossible to not inadvertently run into one another in a town of 1,200 people or not know that the child was living in Sandoval for several years. There's a tiny school. That was the evidence at the time of the trial in Sandoval. How he would have known that or not wanted to be involved in the child's life is beyond me. And I think it's beyond this court at the time of the trial and the time of the decision. So I think when you talk about just having a reasonable degree of interest or concern for the child, when you don't make any effort for five years, that's 60 months, and you don't even try to visit, you can petition the court. You can do it without having to file a fee. You can do something to try to enforce your rights. But he did nothing. He sat back and did nothing during this time frame. Under the issue of desertion, again, the same issue. There's no cards, no gifts. He never sought visitation. He didn't, especially the last three months after leading to the petition for adoption, there was nothing. So clearly the court could reasonably find that there had been desertion. And then when you get to the third allegation in the petition for adoption where he didn't visit for a period of 12 months, well, he admitted he didn't do it. So the clearly convincing evidence was, quite frankly, overwhelming on the issue of unfitness. That gets us to the second issue, and that is whether or not it is in the best interest of the child that a parent's rights be terminated. Now, under this provision, it is not a clearly convincing evidence standard. It is a preponderance of the evidence standard, and I think that's significant, especially in light of the argument this morning. Not that it wasn't clear and convincing at the time of the trial, but it is a little lesser burden of proof. So when you start talking about that, again, you're looking at it was more probably true than not true. There was a case cited in my brief called NREDT, and I think this is an important case because it reminds us that when we get to this portion of an adoption proceeding, the focus is no longer on the natural parent whose rights are sought to be terminated. The focus now becomes the child, because at this point, and I'm going to just quote what this case said, but it says that the parent's interest in maintaining a parent-child relationship must yield to the child's interest in a stable, loving home life. Again, focusing on the child, not necessarily the parent. Now, with the factors that are outlined that the court is to consider, you have to look at some of the things that have occurred with regards to the father, but you can look at it from the standpoint of the child. What has the child seen? Now, I can go factor by factor here, but I'm going to summarize this pretty easily. When counsel argues that there was very little evidence or the only two people that testified were my client and her husband, quite frankly, that was always necessary, because in this case, what you're focusing on is what's going on with the child. So here's what we've got. We've got a relationship that started in 2007 between Brandon and Susan Miller. At that time, the child was probably no more than a year, maybe a little more than a year old. So since the time the child was one year old, Brandon Miller, who was seeking to adopt this child with my client, has been the father figure for this child, certainly since 2009, and so the only father figure I would submit that this child has seen is Brandon Miller. The evidence also was the types of things that Brandon Miller and his child did together as, quite frankly, a father-son type of relationship. They got into the types of things they enjoyed doing together and how often they would do those things together. The evidence talked about the family relationships, and not only the family relationships between mom and the child, the proposed adopting father and the child, but also there's half-siblings involved here, too, and a relationship between this child and the half-siblings and the extended family that both parents have in the area. There was evidence about that. There was also evidence about what the child was doing with regards to his school and how he was doing academically and what he was doing extracurricular-wise and what he was doing in terms of whether it was sports or otherwise and how the family and extended family would go to these events, would go to these events, so that you have an active family that this child is interacting with throughout these several years where the natural father has done nothing and does nothing to try to have a relationship. The court made an interesting comment towards the end of its ruling, and the comment was something to this effect, was it was kind of a strange to even say that Mr. Stanford and the child had a relationship. They really didn't. If anything, the only thing that this child really had in terms, again, of a father figure was Brandon Miller. I also think it's interesting that Counsel wants to bring up this idea of what happened in the interview. I have to admit, the interviewer was interested in reading the transcript about how the judgment went about, but if you read it and just focus in on what the child says, the child wanted to be a Miller because, quite frankly, that's all the child knew. He hadn't had interaction with the natural father in this case. Everybody in the household was a Miller, not him. He wanted to be a Miller. In fact, the evidence was that when he played basketball and they got to put his last name on the back of his uniform, he wanted Miller. That's his identity, which was actually one of the factors that the court was to consider, the development of the child's identity. And he was seeing himself as a Miller, and that's what he saw. The child definitely wanted Brandon Miller to be his dad. That was conveyed through the interview. As for the issue concerning the GAL, the GAL made efforts to try to contact the natural father. I guess you can debate probably any case where there's a GAL involved, whether or not they did enough or didn't do enough in terms of what they did in a particular case. But I actually think that the failure of the father to also respond to contacts that were made by the GAL is just kind of a microcosm of his feeling about the relationship with his child. If he really cared, he would have responded to the GAL when the GAL tried to contact him. Whether she did it two times, four times, six times, it doesn't matter. The fact that he didn't actively say, look, I want to talk with this woman. He could have done that. The argument here is, well, the GAL could have come up to him and interviewed him in the midst of the trial. He could have done the same thing if he really wanted his side of the story to be heard. But that didn't happen, and I think that just shows where the head was of the natural father, his intent in terms of this whole case. And when you just break it down, when you get down to the proponents of the evidence, this child has a loving family that he's interacted with for almost his entire life. He is now, I think he just turned 11. His entire life. He does not have a relationship with his natural father. The natural father has not pursued it whatsoever. And it's time for this child to be able to identify himself as a Miller and to become, not that he doesn't feel part of the family, but it's time for him, in effect, to just become more integrated into that family unit with that name. And I think in this case, it was time for this to occur, and I think certainly the proponents of the evidence was that this child, it was in the best interest of this child that the rights be terminated. If anybody has any questions. Thank you very much. Thank you. Mr. Hatch? I left him off. In the, in Canberra, I got five minutes? Five? The court asked, and this is to Jacob, this has nothing to do with your mom and the person you live with, and if this adoption proceeding does not proceed, then Chad still has parental rights. That means he has rights such as visitation, rights to have visitation with you, as well as other things. He answers, he could visit me. I will run away. There is no discussion between the judge and the minor as to the underlying reason for that. Further on, the court says, I will say that again. I got the names mixed up. So if the adoption would proceed and the petition granted, Brandon would be your new dad. Chad's rights would be terminated, but Brandon would be the legal dad, not only the person you live with. You understand, yes. His response, how can she type that fast? Talking about the court report. Later, the court says, what I want to know, Jacob, is what your wishes are. So here are the choices. Chad's rights are not terminated. He is your legal father, and you continue to live with Susan and Brandon as you have up to this time. Yes. So here it says, Chad's rights are not terminated. He is your legal father, and you continue to live with Susan and Brandon as you have up to this time. Jacob says yes. And so what I'm trying to say is, it appears, and if you go through all of it, I only have five minutes here, you're going to see a pattern of not getting to the underlying relationship, if any, that Jacob had in terms of his father because of the influences of Susan and Brandon. They bring up that Chad didn't do anything. The question is, why? And it's our position, based upon what's talked about, if you have continual hostility towards each other, and at one point the testimony is that Susan hit Chad's father with a truck at one of these discussions. They say he pulled out a gun, which he denied, that Chad's reasons for not having contact at his young age because of the impediments, and there's case law that I cited in there about the impediments that someone causes, should be considered in why he did, up to the age of 10, not have that much contact with him. To hit the child's point of view, wasn't the real father a stranger? Because when he's one, he didn't know. If that's the only time he saw him, was that the hearing? Had he ever seen him? I don't think he saw him at the hearing. Oh, he didn't show up at the hearing. Oh, he might have. So he never saw him. But my point is, what influences did the parents have on his beliefs about his dad by comments really it's never drawn into? You know, he says, the judge asked him, well, were you ever threatened to say something? Well, what does that mean to a 10-year-old? Did your mom ever ask him, has your mom ever talked about your real dad? There's nothing. She didn't, maybe. Well, I think it's incumbent upon the judge to go into the background and find out if there's any influence on this child other than a two-minute in camera where you don't know the underlying reasons of any relationship. He was never asked, have you ever seen your dad, or why would you run away? And so what I'm saying is that with our ability to cross-examine and get in there and address these issues, that it takes the findings of the court because you don't go to the underlying reasons in an in-camera interview. The in-camera interview should be focused on the child and try to get the undercurrent of what's going on, what's happening. The child's going to come in there in an in-camera, and he's going to blurt out answers. But it's up to the judge, and the GAL's there. The GAL never asked any questions. To go to the underlying, what's the reason for this animosity towards his dad? Is it because he's never seen him, or is it because of something that his parents have said about him? Is it something that's influenced him in saying his rights would be terminated? What does that mean to a 10-year-old? My thing was just, wasn't he not just neutral on that? He did not have an opinion, did he? The minor? Yes. I think he bounces back and forth on all these questions because of the way they're worded. So I think it's incumbent upon the GAL and the court to find out what's causing this. And without that, it's basically a biased finding because we don't find out why this minor feels the way he does, other than he must not have been there. So what we're arguing. I think your time is up. Okay. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.